# CHARLESTON

SMITH v. BOARD OF EDUCATION OF PARKERSBURG DISTRICT.

Submitted May 4, 1915.    Decided May 18, 1915.

CONTRACTS—*Building Contract—Drawings and Specifications—Construction—Architect—Agency—Authority of Architect—Change of Plans—Liability of Owner—Mutual Mistake—Right to Relief.*

A contract between the owner and builder, for the erection of a house, expressly referred to the drawings and specifications, prepared by the architect and adopted by the owner, and identified by the signatures thereon of the contracting parties, and made them parts thereof.  The drawings showed, by printed words in the spaces representing the corridors, that vitrolite wainscoting was to be used therein, but the specifications made no mention of it, and, before bidding for the work, the contractor examined both the drawings and specifications, but was informed by the architect that vitrolite was not to be used, and that he would erase the words relating to it from the drawings, but he failed to do so, and did not advise the owner of what he had told the contractor, who bid for the work as a whole and did not, in terms, either include or exclude vitrolite. He refused to put it in and completed the building without it. The owner then caused it to be put in, and deducted the cost thereof from the amount of the contractor's bid; and he thereupon filed his bill in equity, alleging a mistake in the contract and praying for a reformation of it and for a decree for the balance claimed to be due him.  *Held:*

I.    The drawings and specifications are both parts of the contract, and are not inconsistent with each other because they both do not show that vitrolite was to be used in the corridors; one supplements the other.  (p. 240).

II.    That the architect is only a special agent, whose authority depends upon the terms of his employment, or upon the terms of the contract between the owner and contractor.  (p. 240).

III.    That the architect had no authority to change the plans and disperse with vitrolite wainscoting in the corridors, without the consent of the owner.  (p. 240).

IV.  That the owner is not responsible for the mistaken reliance of the contractor upon the supposed authority of the architect. (p. 240).

V.  Equity will not reform a contract on the ground of mistake unless the mistake is mutual, or, if not mutual, unless it was known to the other party who has been guilty of inequitable conduct; or unless one party, either by conduct or representations, has caused the other to be misled. (p. 243).

Appeal from Circuit Court, Wood County.

Suit by Charles A. Smith against the Board of Education of Parkersburg District. From decree for defendant, plaintiff appeals.

*Affirmed.*

*Smith D. Turner,* for appellant.

*L. N. Tavenner* and *Kreps, Russell & Hiteshew,* for appellee.

WILLIAMS, JUDGE:

This suit was brought by Chas. A. Smith to reform a builder's contract made by him with the Board of Education of Parkersburg District, for the erection of a twelve room schoolhouse at the corner of Seventh Street and Park Avenue in the City of Parkersburg, and to recover an alleged balance of $1,387.25 claimed to be due on the contract. A decree was made on the 7th of July, 1914, adjudging that plaintiff was not entitled to any relief and dismissing his bill; and he has appealed.

The minutes of the various meetings of the board of education show that on June 6, 1910, a resolution was passed inviting architects to "submit plans for a 12 room building, subject to the approval of the Board of Education, at the next meeting." William Howe Patton and D. W. Daily, associate architects, submitted plans, and, by a resolution passed on the 17th of June, 1910, their plans were adopted, and they were employed as architects of the building, and by resolution passed August 26, 1910, they were instructed to advertise for bids for the erection of it. Pursuant to their advertisement five separate scaled bids were filed with the board of education, and at a meeting of said board, held on

the 12th of September, 1910, the bids were opened and in-
spected, and the contract awarded to plaintiff, at the price
of $29,400.00, his being the lowest bid. The written contract,
however, was not signed until November 11, 1910, although
dated 12th of September, 1910. The matter in dispute relates
to the use of vitrolite wainscoting, which the plans, adopted
by the board of education, required to be used in the corridors
on the first and second floors, plaintiff claiming that he was
informed by Mr. Patton, one of the architects, that it was not
to be used and, therefore, he did not include it in his bid,
and the board claiming that it did not authorize the architect
to alter the plans in that respect, and awarded plaintiff the
contract because it understood his bid to include vitrolite
wainscoting. Plaintiff refused to put it in, and completed the
building without it. The board then caused the corridors
to be wainscoted with vitrolite, at a cost to it of $1,387.25,
and deducted that amount from plaintiff's bid.

The written contract expressly makes both the drawings
and specifications a part of it, hence they must be looked to
in order to determine what was comprehended in the contract.
Neither the signed agreement nor the specifications expressly
mentioned vitrolite, but the drawings or plans show that it
was to be used, and they are as much a part of the contract
as the specifications, both are identified by the signatures of
the contracting parties, and, in terms, referred to as parts of
the contract. On the first floor plan, in the space represent-
ing the hall, printed in conspicuous letters, are these words:
"Note:—Walls of corridors is to be wainscotted with vitrolite
M'f'g by Meyercord-Carter Co.;" and similar words appear
in the space representing the hall on the second floor plan.
In a third plan, representing a longitudinal section of the
building, with a portion of the roof, the word "vitrolite" is
printed in each of the spaces representing the hallways.
These words appear in plain, white letters on the blue-prints,
and are facsimiles of the original drawings. These prints were
examined by the bidders, before making up their estimates
and filing their bids. There is no inconsistency between the
drawings and the specifications; the omission of the latter
to mention vitrolite is supplied by the drawings which show
it was to be used. They are a part of the contract, and do

not conflict with the specifications, which are simply incomplete in that respect. But it is wholly unnecessary to further discuss a question which the nature of the suit admits. If vitrolite were not included in the terms of the contract, plaintiff would have no standing in a court of equity, for his suit is one to reform that express contract, and equity can entertain it on no other ground.

The theory on which plaintiff has framed his bill is, that the inclusion of vitrolite was either a mutual mistake of the contracting parties, or a mistake on his part, and fraud or inequitable conduct equivalent thereto, on the part of defendant; and to support this contention he relies on the statement made to him by Patton, one of the architects, before he put in his bid, that vitrolite was not to be used, and that he would cancel the words printed on the drawings, showing that it was to be used. The architect admits he made the statement to plaintiff, but he did not erase the words. This representation was made to plaintiff after the board of education had adopted the plans for the building, as shown by the drawings, and was made without its authority or knowledge. The work on the building was begun in the fall of 1910, and progressed until sometime in 1911, when the time came for vitrolite to be put on. Mr. Daily, associate architect with Mr. Patton, then called plaintiff's attention to the fact that it was about time to put on the vitrolite, and a dispute arose between them, as to whether it was to be used, and whether it was included in plaintiff's bid. Mr. Daily did not know that Mr. Patton had told plaintiff not to include it in his bid, and he immediately informed the board of education of plaintiff's contention. That is the first time it knew of plaintiff's alleged misunderstanding of the agreement. Plaintiff's was a lump bid for the entire work, it did not expressly include or exclude vitrolite. The president of the board of education testified that he asked plaintiff, at the meeting when the bids were opened, if he included vitrolite in his bid and he replied that he did. Plaintiff denied that he made the statement, and there is much conflict in the testimony respecting what was actually said at that time. In our view of the case, it is not necessary to determine that disputed fact, for, even if plaintiff's testimony be regarded as true, we do not think it proves a case

entitling him to relief. Assuming, therefore, that he bid for the work, with the honest belief that the plans had been changed, respecting the use of vitrolite, and did not intend his bid to include it as a part of the material to be furnished and work to be done by him, still the other contracting party had a different understanding respecting his bid, and the contract was made according to that understanding, and if the board of education is not responsible for plaintiff's having been misled, he has no cause of complaint against it. The board had made no change in the plans, as originally adopted by it, and was wholly ignorant of what Patton had told plaintiff, as was likewise his associate architect, Daily. Patton admits he never consulted the board, to know if it desired the change, and never informed it that he had told plaintiff he would erase the words relating to vitrolite from the drawings; and the contract, subsequently signed, includes it. It is fully established that the board of education acted under the belief that plaintiff's bid included vitrolite. The mistake, therefore lacks mutuality. *Crim* v. *O'Brien*, 69 W. Va. 754. And, unless the board of education has been guilty of some act, or omission of duty, which misled plaintiff and caused his mistake, the written contract is conclusive. Equity will not reform a contract on account of a mistake made by one of the parties, when the other has been guilty of no inequitable conduct. 3 Elliott on Contracts, Sec. 2370; *Williams* v. *Hamilton*, 104 Io. 423; and *Whitworth* v. *Lowell*, 178 Mass. 43. It is not contended that the board of education has been directly and personally guilty of wrong, but it is urged that, by referring the contractor to the architect, and requiring him to conform to "all directions relating to the work given by the Architects as interpretations of the requirements of the drawings and specifications," the board thereby constituted him its general agent, and is, therefore, bound by his acts and representations. Neither the clause above quoted from, nor any other clause found in either of the separate papers constituting the entire contract, conferred power upon the architect to change the plans which had been adopted. The above clause only authorized the architect to interpret and explain the drawings and specifications, not to make changes in them. There is a clause in the specifications,

just preceding the one quoted from,' which expressly provides that any increasing, diminishing or making changes in any part of the work, is to be done upon the written order of the architect, "when approved by the owners," meaning the board of education. Article I of the agreement expressly refers to the drawings and specifications prepared by Patton and Daily, associated architects, and makes them parts of the agreement, in the following words, viz.: "which drawings and specifications are identified by the signatures of the parties hereto, and become hereby a part of this contract." Article II provides that the work shall be done under the direction of said architects, and that their decision "as to the true construction and meaning of the drawings and specifications shall be final." That article concludes as follows: "It is also understood and agreed by and between the parties hereto that such additional drawings and explanations as may be necessary to detail and illustrate the work to be done are to be furnished by said Architect, and they agree to conform to and abide by the same so far as they may be consistent with the purpose and intent of the original drawings and specifications referred to in Art. I." This language shows that no change in the original drawings was contemplated, and that the architects were not authorized to make alterations in them. The pronoun "they" refers to architects, and the clause binds them to conform to the adopted plans and specifications. It would be useless to submit drawings of a building to the owner for his inspection and adoption, if the architect had the power, to be exercised *ad libitum*, to make such material alterations and changes therein as he might think proper. The architect is not, by virtue of his employment as such, the owner's general agent for all purposes, in the erection of the building. His powers and duties are limited by the terms of his contract of employment, or by the terms of the contract between the owner and builder. 6 Cyc. 29; 3 Page on Contracts, Sec. 1465; 4 Elliott on Contracts, Sec. 3614; *McNulty* v. *Keyser Building Co.*, 112 Md. 638; *Langley* v. *Rouss*, 185 N. Y. 201; *Chicago Lumber & Coal Co.* v. *Garmer*, 132 Io. 282, 109 N. W. 780; *Volquardsen* v. *Davenport Hospital &c. Co.*, 161 Io. 706, 141 N. W. 432; *Sweeney* v. *Aetna Indemnity Co.*, 34 Wash. 126, 74 Pac. 1057; and

*Leverone* v. *Arancio,* 179 Mass. 439, 61 N. E. 45. Being only a special agent of the owner, it is incumbent on a person dealing with the architect to ascertain the extent of his authority, for it is a well established principle that an agent's acts, in excess of his authority, do not bind the principal. The only evidence of Patton's authority as agent of the board of education is found in the contract between said board and plaintiff, and, as we have already seen, it does not empower him to change the plans without the board's approval. The board is not responsible for plaintiff's mistake, it was guilty of no inequitable conduct which could have caused the mistake; and there is no evidence that it even knew of it, until long after the contract was entered into.

The fact that vitrolite is manufactured in different thicknesses and weights, and is attached to the walls by different methods, coupled with the fact that neither the drawings nor the specifications gave any information concerning the thickness desired or the method of putting it on, in consequence of which it is argued that the bidder could not bid intelligently on that part of the work, does not alter the terms of the contract, nor relieve plaintiff from performing it. Those objections relate to mere matters of detail, concerning which the bidder, if he considered them material, should have informed himself before putting in his bid; or else he should have expressly excluded vitrolite from his bid, so that the board of education could not have been misled by the manner of the bid.

There are a number of legal propositions discussed in the briefs of learned counsel, which are not necessary to be passed upon in a determination of the case, and, therefore, we have not considered them in this opinion. The decree is affirmed.

*Affirmed.*